Merrimack
No. 89-069

## New Hampshire Municipal Trust Workers' Compensation Fund & a.

### v.

## Richard M. Flynn, Commissioner of New Hampshire Department of Labor

April 11, 1990

18

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Richard E. Galway* and *Stephen J. Schulthess* on the brief, and *Mr. Galway* orally), for the plaintiffs.

*John P. Arnold*, attorney general (*Emily Gray Rice*, assistant attorney general, and *David S. Peck*, assistant attorney general, on the brief, and *Ms. Rice* orally), for the defendant.

*H. Bernard Waugh, Jr.*, of Concord, by brief for the New Hampshire Municipal Association, as *amicus curiae*.

BATCHELDER, J.   The defendant, the Commissioner of the State Department of Labor, appeals from a ruling by the Superior Court (*Morrill*, J.) on the plaintiff's petition for declaratory judgment that found RSA 281:2, V-b (Supp. 1988) unconstitutional under part I, article 28-a of the New Hampshire Constitution. On appeal, the defendant claims that RSA 281:2, V-b (Supp. 1988) (hereinafter referred to in its current form at RSA 281-A:17, II (Supp. 1989)) is constitutional because it neither mandates nor assigns a new, expanded or modified program or responsibility. For the following reasons, we affirm.

On May 17, 1984, Resolution 105 was introduced to New Hampshire's Seventeenth Constitutional Convention. This resolution was referred to the Committee on County and Local Government, which recommended by a vote of 25 to 1 that the resolution be adopted. This resolution stated:

"Art. 28-a. Mandated Programs. The state shall not mandate or assign any new, expanded or modified programs or responsibilities to any political subdivision in such a way as to necessitate additional local expenditures by the political subdivision unless such programs or responsibilities are fully funded by the state or unless such programs or responsibilities are approved for funding by a vote of the local legislative body of the political subdivision."

On June 26, 1984, Resolution 105 was placed before the full convention, and it was subsequently adopted by a vote of 272 to 62. Thereupon, the resolution was referred to the Committee on Form and Style so that the amendment could be rewritten in the form of a question that would appear on the voters' ballot. To help the voters understand the proposed amendment, a Voters' Guide was prepared that contained not only the questions being considered, but also a brief synopsis of their intended effect. The following excerpt came from the Voters' Guide:

"2. Are you in favor of amending the Constitution to prohibit the state from mandating or assigning any new, expanded, or modified programs or responsibilities which require additional local expenditures to any political subdivision, unless such programs or responsibilities are either fully funded by the state or approved for funding by a vote of the local legislative body of the political subdivision?

\*       \*       \*

IF THE AMENDMENT IS ADOPTED:

The state will be prohibited from requiring localities to expend funds for any new or expanded portion of a program or responsibility unless the state provides the necessary funds for the localities to spend or unless the local legislative body agrees to provide its own funding for the new or expanded program or responsibility."

On November 6, 1984, the citizens of the State ratified article 28-a by a vote of 237,045 to 99,172, a margin that exceeded the two-thirds majority required by part II, article 100 of the New Hampshire Constitution.

In 1947 the legislature enacted RSA chapter 281, relative to workers' compensation. This legislation, as well as its predecessor, envisioned a no-fault system whereby workers were to be compen-

sated for injuries solely on the basis of the relationship that exists between employer and employee, without regard to negligence. *Mulhall v. Company*, 80 N.H. 194, 197–98, 115 A. 449, 452 (1921). The consensus has been that without such legislation remedies for workers would be "uncertain, slow and inadequate." *Id.* at 196, 115 A. at 452. However, RSA chapter 281, as originally enacted, was not all-encompassing. Since its enactment, RSA chapter 281 has been frequently amended. One such amendment is RSA 281-A:17, II (Supp. 1989), which provides as follows:

"II. Notwithstanding the provisions of RSA 281-A:2, XI and XIII, 16 and 27, there shall exist a prima facie presumption that cancer disease in a firefighter, whether a regular, call, volunteer, or retired member of a fire department, is occupationally related. In order to receive this occupational cancer disability benefit, the type of cancer involved must be a type which may be caused by exposure to heat, radiation, or a known or suspected carcinogen as defined by the International Agency for Research on Cancer. However:

(a) A call or volunteer firefighter shall have the benefit of this prima facie presumption only if there is on record reasonable medical evidence that such firefighter was free of such disease at the beginning of his or her employment. It shall be the duty of the employer of call or volunteer firefighters to provide the required reasonable medical evidence. If the employer fails to do so, the call or volunteer firefighter shall have the benefit of the prima facie presumption regardless of the absence of said reasonable medical evidence.

(b) A retired firefighter who agrees to submit to any physical examination requested by his city, town, or precinct shall have the benefit of the prima facie presumption for a period of 20 years from the effective date of such firefighter's retirement."

On appeal the defendant claims that the superior court erred in finding RSA 281-A:17, II (Supp. 1989) unconstitutional. The defendant argues (1) that RSA 281-A:17, II (Supp. 1989) does not mandate or assign a new, expanded or modified program or responsibility within the meaning of part I, article 28-a of the New Hampshire Constitution because it merely requires a procedural change in establishing eligibility for benefits under pre-existing workers' com-

pensation laws, and (2) that, because the State does not mandate that local government provide fire fighting services, any increase in the cost of providing workers' compensation coverage is voluntarily incurred.

As we have stated on numerous occasions, this court will not disturb the trial court's findings or rulings unless they are not supported by the evidence or are erroneous as a matter of law. *In re Estate of Hebert,* 130 N.H. 548, 552, 543 A.2d 422, 424 (1988). When our inquiry requires us to interpret a provision of the constitution, we view the language used in light of the circumstances surrounding its formulation. *Opinion of the Justices,* 126 N.H. 490, 495, 494 A.2d 261, 266 (1985). "We will look to its purpose and intent, bearing in mind that we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast." *Id.* at 495, 494 A.2d at 267. The statements made by the delegates to the constitutional convention are not always significant in determining the meaning of a particular amendment. To be entitled to consideration, the delegates' statements must interpret the amendment's language in accordance with its plain and common meaning while being reflective of its known purpose or object. *See Maxwell v. Dow,* 176 U.S. 581, 602 (1900). After all, we will not redraft the constitution in an attempt "to make it conform to an intention not fairly expressed in it." *Concrete Company v. Rheaume Builders,* 101 N.H. 59, 61, 132 A.2d 133, 135 (1957). This rule of constitutional interpretation was followed in *Lake County v. Rollins,* 130 U.S. 662 (1888), where the United States Supreme Court stated:

"To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. So, also, where the law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.

There is even a stronger reason for adhering to this rule in the case of the constitution than in that of a statute, since the latter is passed by a deliberate body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in the State, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is most likely to be that meant by the people in its adoption."

*Id.* at 671–72 (citations omitted).

Thus, in an effort to ascertain the meaning of article 28-a, we now turn to the language of the amendment itself. In particular, we focus on the phrase "any new, expanded or modified program or responsibility." Since the term "responsibility" is susceptible to a more expansive reading than the term "program," we will first ascertain its meaning within the context of article 28-a.

The term "responsibility" is defined as "the quality or state of being responsible: something for which anyone is responsible or accountable," and "responsible" is defined as "likely to be called upon to answer: creditable or chargeable with the result." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1935 (1961). When these definitions are read in conjunction with the remaining language of the amendment, they indicate that the amendment was designed to prohibit the State from placing additional obligations on local government without either obtaining their consent or providing the necessary funding. This interpretation is supported by the following excerpts from the Journal of the Constitutional Convention.

"Del. Pepino: Mr. President, Honorable Delegates to this Convention. I rise in support of the Committee recommendation. If this were adopted, this would prevent the State Legislature from mandating new programs, services, or *expenses* to local cities and towns without also providing the necessary funding to local communities. Too often in the last ten years has the Legislature seen fit to respond to various special interest groups at the expense of local communities, and their respective property taxes. . . ."

(Delegate Pepino, JOURNAL OF THE CONSTITUTIONAL CONVENTION 325 (1984) (emphasis added)).

> "Del. Lovejoy: Thank you, Mr. President, fellow delegates. Resolution 105 is the Resolution in this convention that has received the most attention from the cities and towns, and from the people back home. It is a clear and simple statement from the people in the local communities to state government, to keep local budgets local, and keep state budgets state. It tells the Legislature that the communities no longer want the state government to mandate local *spending*, and thus bypassing the local budgeting process."

(Delegate Lovejoy, JOURNAL OF THE CONSTITUTIONAL CONVENTION 326 (1984) (emphasis added)).

■ It is clear from these statements that the delegates to the convention were not as concerned with the categorization of a particular State mandate, *i.e.*, whether or not it may be considered a new, expanded or modified program, as they were with its net effect. Thus, it is logical that the delegates understood the term "responsibility" to act as a sweeping prohibition against all State mandates that, for one reason or another, may not be categorized as a program. Furthermore, if we were not to give the term "responsibility" a broader interpretation than the term "program," it would render its inclusion meaningless. Most importantly, this interpretation is consistent with the language's plain and common meaning and, in the absence of evidence to the contrary, is likely to be the meaning that was embraced by the electorate in the ratification of article 28-a. Accordingly, we hold that the constitutionality of a particular State mandate under article 28-a does not hinge solely on whether or not it may be categorized as a new, expanded or modified program, but also on whether or not the mandate imposes upon local government an additional fiscal obligation. Hence, we now turn to the language of RSA 281-A:17, II (Supp. 1989) to determine whether it imposes such an obligation.

RSA 281-A:17, II (Supp. 1989) was enacted in an effort to ease the burden faced by fire fighters in establishing that their cancer was occupationally related. The statute created a *prima facie* presumption that a fire fighter suffering from cancer incurred the disease while employed, provided that for call or volunteer fire fighters, reasonable medical evidence demonstrated that the fire fighter was free of the disease at the beginning of employment. Prior to the enact-

ment of the statute, the employee had to show not only the absence of cancer upon employment, but also that the cancer was work-related.

In the trial court, the plaintiffs argued that due to the inherent difficulties in proving that the cancer was work-related, application of this presumption would increase the likelihood that afflicted fire fighters would receive benefits. Based upon the testimony of two experts, the superior court found that the existence of the presumption would in fact increase the number of successful claims. The court also found that many of these successful claims would be based upon cancer that was not work-related. The trial court attributed the success of both legitimate and illegitimate claims to the fact that RSA 281-A:17, II (Supp. 1989) made it much easier for the employee to meet its burden of proof.

The trial court heard additional evidence as to the fiscal impact of this presumption upon local governments and concluded that they would necessarily incur new and additional costs in providing workers' compensation coverage. These costs would be incurred both in conducting pre-employment medical examinations designed to detect cancer and in paying benefits to fire fighters who, because of the presumption, would qualify for benefits although their cancer was not work-related. Thus, the effect of the legislative change is to mandate a responsibility upon local government to provide benefits for illnesses not covered under the prior law.

■ Since we see no indication that these findings were unsupported by the record, we hold that the enactment of RSA 281-A:17, II (Supp. 1989) imposes upon local government a new fiscal obligation. While it is true that we will not construe a statute in a manner that renders it unconstitutional where it is susceptible of a reading to the contrary, *White v. Lee*, 124 N.H. 69, 77–78, 470 A.2d 849, 854 (1983), this does not mean that we must, in the alternative, construe the constitution in a manner that yields the same result. Having determined that RSA 281-A:17, II (1989), by its very nature, imposes a new fiscal obligation upon local government, we cannot say that there is any other interpretation that would lead us to a different conclusion.

Additionally, the defendant argues that even if RSA 281-A:17, II (Supp. 1989) increases the cost to local government of providing workers' compensation coverage, article 28-a nonetheless permits the legislature to make procedural changes to existent legislative schemes. The defendant's argument starts from the premise that ar-

ticle 28-a permits regulatory agencies to promulgate new regulations pursuant to authority that predates the amendment's adoption. He then proceeds to argue that because article 28-a permits such regulatory action it must also be interpreted to permit the legislature to make procedural adjustments to pre-existing legislative schemes. In support, the defendant cites to a verbal exchange between Delegate Hess and Delegate George Roberts concerning the constitutionality of administrative regulations requiring local government to bear the expense of capping landfills. JOURNAL OF THE CONSTITUTIONAL CONVENTION 324–25 (1984).

As previously stated, not all statements made by the delegates are helpful in ascertaining what the electorate understood the amendment to mean. An interpretation of a particular amendment that requires a technical or limited reading of its language is of little constitutional significance when such an interpretation is not widely recognized and is based upon the delegate's own subjective reading. What the language is presumed to have meant to the electorate controls over the isolated opinions of the convention delegates.

A plain reading of the language contained within article 28-a fails to disclose any indication that the amendment was designed to exclude all regulatory acts conducted under pre-existing authority. Moreover, the 1984 Voters' Guide fails to explain that the amendment was to have such a limited scope. The language refers to action by "the state," which cannot be reasonably construed to exclude acts by a regulatory body of State government. The fact that the act is carried out under existing authority does not make it constitutional merely because one delegate was of the opinion that, in such a case, the statute did not mandate or assign a new, expanded or modified program or responsibility. Notwithstanding the delegate's opinion to the contrary, a statute may still be found unconstitutional if the delegate's interpretation, as was the case here, is so technical or obscure that the electorate would not have understood the language of the amendment to have such a meaning.

In further response to the defendant's argument that article 28-a permits the legislature to make procedural adjustments to current legislative schemes, the following excerpt from the constitutional convention is particularly instructive.

> "Del. Sanborn: Thank you, Mr. President. Delegate Granger, very recently I have been reading in the paper where the State Board of

> Education has indicated that we are not graduating fully educated pupils from our high schools and they have now stated that their requirement will be, I believe, nineteen points before you can graduate. Now isn't that mandating extra programs on the state.

Del. Granger:   That is.

Del. Sanborn:   On the Towns.

Del. Granger:   That certainly is, Senator Sanborn."

(Delegates Granger and Sanborn, JOURNAL OF THE CONSTITUTIONAL CONVENTION 321 (1984).

■ Setting aside the question of whether or not the increase in proficiency requirements for high school graduation is an expansion of an existing program, this exchange indicates that the convention understood that the amendment applied to procedural adjustments to pre-existing legislative schemes. Additionally, unlike the statements of the delegates offered by the defendant, these statements are consistent with the language's plain and common meaning. In light of the foregoing, we find no merit to the defendant's argument that article 28-a permits the legislature to make procedural adjustments to pre-existing legislative schemes regardless of the financial burden imposed upon local government. For us to hold otherwise would require that we rewrite the constitution, creating limitations that are not clearly expressed by the language contained therein.

■ Finally, the defendant argues that RSA 281-A:17, II (Supp. 1989) is nonetheless constitutional because the State does not mandate, in the first instance, that the local government provide fire fighting services. In opposition to this argument, the plaintiff claims that this issue was not raised at the trial level and, as a result, was waived on appeal. We agree. As we stated in *State v. Stearns*, 130 N.H. 475, 486, 547 A.2d 672, 678 (1988), those issues that were not raised below are not subject to review on appeal. Furthermore, the issue of whether or not the State mandates that local government provide fire fighting services is an issue of fact solely for the trial court. A review of the record fails to disclose that this issue was raised or developed below. Hence, in the absence of such a record it would be inappropriate for us to consider the issue at this time. *Id.* at 491, 547 A.2d at 681.

The constitutional amendment which we consider today was designed to provide a safety net to save cities and towns from the burden of coping with new financial responsibilities, not of their own creation, and to permit them a stronger grasp of their fiscal affairs.

■ Accordingly, we hold that RSA 281-A:17, II (Supp. 1989) imposes upon local government a new responsibility within the meaning of article 28-a of the New Hampshire Constitution, and in those instances where the State has failed to either obtain the consent of local governments or provide them with the requisite funding, it is also unconstitutional.

■ In holding as we do today, we do not imply that actions of the State judiciary, that by their nature may impose a new, expanded or modified responsibility upon local government, are also unconstitutional. On the contrary, it is the duty of the judiciary to interpret the law, not make it. *Opinion of the Justices*, 85 N.H. 562, 567, 154 A. 217, 223 (1931). In the context of article 28-a, it is the law that mandates or assigns any new, expanded or modified responsibilities; the judiciary merely declares under what circumstances it does or does not. Furthermore, article 28-a contemplates a set of circumstances whereby local government can reject a particular State mandate by failing to approve local funding. Thus, if we were to interpret article 28-a as applying to acts of the judiciary, we would necessarily clothe local government with the authority to reject the decisions of the judiciary at their own election, thereby reducing the doctrine of separation of powers to a nullity. This we shall not do. *Dick v. United States*, 208 U.S. 340, 353 (1908).

*Affirmed.*

SOUTER, J., with whom THAYER, J., joined, dissented; the others concurred.

SOUTER, J., dissenting: I join in the court's view that an unfunded legislative mandate enacted after the adoption of part I, article 28-a of the Constitution of New Hampshire does not exceed the enforceable legislative power as limited by that article unless the mandated program or responsibility would expand the subject matter of a political subdivision's obligation, and the augmentation would require increased expenditure. Although these ostensibly simple terms promise a long future of litigation before they become exactly understood, their distinctiveness is clear.

Nor do I disagree that the amendment to RSA 281-A:17, II (Supp. 1989) has been shown to fall within these terms. There was an evidentiary basis for the superior court's finding that the new presumption of occupational relationship would, if applied, result in some instances of municipal responsibility for paying workers' compensation benefits with respect to fire fighters' cancers that are not actually work-related. This finding by the trial court is properly understood to go beyond the possibility inherent in any subject of litigation, that finders of fact may sometimes make mistakes, and to predict that a new class of coverage-in-fact of people not eligible in theory would result from the extreme difficulty of rebutting the presumption. The finding that this new class of coverage would be a statutory result satisfies the subject-matter condition for invoking article 28-a, and no one in this litigation disputes that the new coverage would cost additional money, whether measured in payments of benefits or insurance premiums.

The case is more complex, however, than these points of agreement would suggest, as can be seen from the fact that the statutory amendment would affect not one, but two classes of workers' compensation claimants. It would affect not only those claimants with cancers unrelated to their firefighting occupation, who would obtain benefits on the strength of the new presumption of causation, but those whose cancers truly are work-related, as well. We must assume that the latter class exists, for we have no basis to go behind the legislative conclusion that some cases of cancer in active or retired fire fighters will be proper subjects of workers' compensation benefits. The effect of the presumption on such claimants with genuinely work-related cancers would not, of course, be to provide coverage where none previously existed, but to provide a means of proving entitlement to benefits where the difficulty of proof might previously have defeated their claims. Although the financial consequences of applying the new presumption to this latter class might well be significant, that alone would not implicate article 28-a, since increased expenditure alone is not equivalent to the expansion of a program or responsibility.

Because the application of the amendment in question could thus be expected to have some consequences that would be rendered unenforceable by article 28-a and some that would be perfectly enforceable against municipal employers, this case cannot be decided without answering an important question about how article 28-a

should be applied when the legislative mandate would have such dual effects. The court today answers that question by holding *sub silentio* that the present plaintiffs' demonstration that some but not all consequences of the amendment in question would be subject to an unsatisfied funding requirement implicating article 28-a renders the amendment totally unenforceable. I am concerned about this element of the court's decision for more than one reason.

In dealing with this question only by implication, the court's assumptions about the proper construction of article 28-a are left uncertain. The court may assume, for example, that when the mandate of a single legislative provision would have such dual constitutional effects, one of them subject to the article 28-a funding requirement and one of them not, the failure to fund the portion subject to article 28-a will always render the entire enactment unenforceable. The court may, on the other hand, assume that the enactment in question here must be declared unenforceable *in toto* only because it would be impossible to determine the extent to which the mandated cost, if calculable in advance, would be attributable to the new responsibility of paying benefits for cancers that are not work-related, as distinguished from the old responsibility of ensuring against occupationally related disease. If the latter reading is correct, I have to admit that I intuitively share the court's judgment insofar as I can draw any conclusion from the present record. (In light of that record, we have to assume that in some cases it would be impossible to tell whether the cancer was work-related; otherwise the new presumption would not have the predictable effect of covering some non-related cancer cases. Going beyond individual cases, the record suggests the difficulty or impossibility of generalizing about the percentage of occupationally related illness among all fire fighters with cancer during or after their careers; while the legislature heard testimony about an occupationally-correlated differential rate of the disease, testimony before the trial court indicated that existing data would support no such general conclusion.)

But however sound that intuition may be on the basis of the existing record, it is only an intuition, and the question implicitly answered by the court was raised neither in the superior court nor before us. Because we cannot adequately deal with such a significant issue when it has not been properly raised, and because we cannot decide the case without dealing with that issue in some way, we should remand for its explicit consideration and the reception of such

further evidence as the parties could present. Because the court takes the contrary course, I respectfully dissent.

THAYER, J., joins in the dissent.